Frederick L. WRIGHT, III, et
al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 520–87C.

United States Claims Court.

Feb. 26, 1990.

Kenneth C. Sandoe, Myerstown, Pa., for plaintiffs.

Richard P. Nockett, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant. Thomas E. Bundy, of counsel.

## OPINION

### MOODY R. TIDWELL, III, Judge:

Plaintiff requests review of the Secretary of Agriculture's determination of fair market value of plaintiff's poultry flock following the flock's destruction at the Secretary's order. Plaintiff also seeks redress for property damaged or destroyed by defendant during the subsequent cleaning and disinfecting of plaintiff's premises.

### FACTS

In 1983, plaintiff Frederick L. Wright was a successful poultry breeder. He had begun his own chicken farm following college and over the years had expanded his operation to include not only the normal raising of chickens for their meat and egg production but also breeding prize winning breeder chickens and a large variety of other birds. During this time frame, plaintiff had worked closely with Mr. Henry K. Miller, an internationally recognized producer of quality, prize winning birds. Plaintiff served as Mr. Miller's clerk for eight years. Ultimately, Mr. Miller entrusted plaintiff with the preservation of the recognized "Miller" bloodlines which represented the culmination of Mr. Miller's lifetime of work. Using Mr. Miller's bloodline, plaintiff later started his own bloodline, colloquially known as the Miller–Wright strain.[1]

By April, 1983, plaintiff's business was successful and he had incorporated as Fred L. Wright, Inc. with three operating divisions: the Willow Hill Hatchery, the hatching operation that provided the chicks for plaintiff's other operations; the Day Old Bird Business, the selling operation that sold the day old birds; and Willow Hill Poultry Farms, the breeding operation that produced hatching eggs for the Willow Hill Hatchery (including also a dressing plant, Willow Hill Poultry, dealing mainly in game birds). Fred L. Wright, Inc. owned two farms located in Berks County, Pennsylvania. The home farm, site of Willow Hill Poultry, Willow Hill Poultry Farms, and the Day Old Bird Business, was located approximately two-and-one-half miles south of Bethel, Pennsylvania. The airport farm, site of Willow Hill Hatchery and a slaughterhouse, was located approximately two-and-one-half miles northwest of Bethel, Pennsylvania.

The evidence presented to the court established that in 1982, one year before the incidents surrounding this action began, plaintiff had an excellent reputation as a breeder. Plaintiff's Day Old Bird Business shipped 250,000 to 300,000 birds a year to over 10,000 customers located on every continent save Antarctica and Australia. Mr. Wright also successfully exhibited his birds at fairs and shows as a hobby but more importantly as a marketing tool for the sale of his breeder birds.

All this was threatened in April of 1983, however, when there occurred an outbreak of a highly contagious viral disease in Lancaster County, Pennsylvania which the United States Department of Agriculture (USDA) later identified as "lethal avian influenza." The Pennsylvania Department of Agriculture (PDA) acted first by quarantining premises in Lancaster County where infected poultry were found. The PDA's action, unfortunately, was not enough to contain the outbreak, and by late October, 1983, the disease had continued to spread within the quarantined areas killing many poultry flocks.

On November 4, 1983, the USDA, legitimately concerned that the continuing spread of avian influenza would affect

---

1. The creation and preservation of recognized bloodlines is an involved process requiring extensive bio-security, genetic selection, isolation of bloodlines during the breeding season, and selection of the day-old chicks for their value as breeders, exhibition or general sale. The entire process of creating a new recognized bloodline takes approximately twenty years of breeding under these exacting requirements.

poultry flocks even further afield, quarantined portions of Berks, Dauphin, Lancaster and Lebanon Counties in Pennsylvania. The USDA's quarantine prohibited interstate movement of poultry and certain related articles from the outlined area. The PDA harmonized its efforts with the USDA by enacting its own even stricter regulations that disallowed movement into, out of, or within the quarantined area.[2] The initial USDA quarantine enveloped plaintiff's home farm and had a serious impact on his business.[3] On November 9, 1983, the Secretary of the USDA declared that an "extraordinary emergency" existed in Pennsylvania due to the outbreak of the virus. Following this declaration, the statute authorized the Secretary to "seize, quarantine, and dispose of [infected] poultry and other items ... to ... carry out the provisions of ... 21 U.S.C. 134–134h...." 9 C.F.R. § 81.10 (1984). One week later, the USDA issued regulations expanding the earlier interim regulations to implement their program to control, eradicate, and prevent the further spread of avian influenza.

By February of 1984, the quarantined areas in Pennsylvania, which had originally included only plaintiff's home farm, had spread to include plaintiff's airport farm. Accordingly, plaintiff's business, which had been severely affected by the earlier quarantine, was now completely stopped.

Although plaintiff's flock had initially shown no signs of exposure, a subsequent test in June, 1984 indicated that at least part of plaintiff's flock had been exposed to the virus. Under the regulations, this necessitated the destruction of plaintiff's entire flock followed by reimbursement at the fair market value, and the cleansing of his facilities. In preparation for the destruction, USDA retained an outside expert to appraise and determine "the fair market value [of the flock] at the time of destruction...." 9 C.F.R. § 81.14 (1984). Fair

market value was to be "determined by the meat, egg production, dairy or breeding value ..." of the animals destroyed. 9 C.F.R. § 53.3(b) (1984). Despite these regulations, the USDA instructed its expert to evaluate the birds on their fair market value as exhibition birds. An appraisal on this basis was done on July 7, 1984 with plaintiff and his own expert accompanying defendant's expert. The two expert appraisers testified to the exhibition value of plaintiff's flock at the time of its destruction. Although this circumstance would appear to give their respective evaluations great validity, the fact is that there was no statutorily designated basis to evaluate the flock as exhibition birds. Both experts followed the USDA *ad hoc* evaluation instructions even though both experts knew that they were not looking at exhibition birds and that plaintiff's flock's value was not as exhibition birds but as breeder birds.

Sixteen days later, on July 23, 1984, USDA ordered plaintiff to destroy his flock by July 26, 1984. At trial it was evident to the court that at the time plaintiff received the USDA's destruction order, plaintiff believed that defendant was willing to discuss the possibility of saving that part of plaintiff's flock which had not been exposed to the virus. In accordance with this belief, plaintiff did not destroy his flock as ordered. Defendant reacted to plaintiff's failure to immediately comply with the destruction order by obtaining a court order to destroy plaintiff's flock. On August 1, 1984, defendant entered upon plaintiff's farms with two federal marshals, four state police officers and seventy-five other federal employees who destroyed plaintiff's flock, sheep, pigs and pet dogs. In compensation for its destruction of Mr. Wright's flock, defendant offered $33,-025.44 by letter dated August 14, 1984. Plaintiff rejected the offer as inadequate.

---

**2.** These harmonizing actions by PDA were interwoven with 21 U.S.C. § 114a and its accompanying regulation at 9 C.F.R. § 53.2 (1984). This court had earlier found that the referenced statute and its regulations must be read in conjunction with a later, more narrow authorizing stat-

ute at 21 U.S.C. §§ 134–134h and its regulations at 9 C.F.R. §§ 81.1–.15 (1984). *Wright v. United States,* 14 Cl.Ct. 819 (1988).

**3.** Plaintiff's airport farm initially escaped the quarantine.

Pursuant to regulation, the USDA also required plaintiff to clean and disinfect his premises before the quarantines placed on his properties could be lifted. Plaintiff, however, could not bear the cost to clean and disinfect his farms because he had been out of business from the preceding November and missed his biggest selling season, from May to the end of July. The PDA attempted to help plaintiff clean his premises in September of 1984, but this attempt was unsuccessful due to a dispute about the manner in which the clean-up was to be accomplished. Consequently, on October 4, 1984, USDA issued a formal order to plaintiff to clean and disinfect his premises. Regardless of the USDA's order, plaintiff's financial situation made it impossible for him to comply. On March 28, 1985, plaintiff and the USDA negotiated an agreement whereby defendant would clean and disinfect plaintiff's premises at defendant's expense. The agreement stated that the on-site director of the government clean-up team would be responsible for deciding which items could be cleaned and disinfected and which would have to be destroyed. The government clean-up operation began on March 29, 1985 and was completed on April 20, 1985. The quarantines on plaintiff's premises were finally lifted on May 21, 1985.

On June 5, 1985, plaintiff submitted separate claims to the USDA pursuant to two separate but related sections of the governing regulations. Plaintiff sought approximately $1.9 million in damages for the destruction of his flock and approximately $39,000.00 for property damages caused by the USDA's cleaning operation. Plaintiff's $1.9 million claim was rejected by letter on September 27, 1985. His property claim was never considered nor acted upon by the USDA.

After exhausting his administrative remedies, plaintiff in June of 1986 filed suit in the United States District Court for the Eastern District of Pennsylvania seeking compensation for the destruction of his flock and for property damage done during the government's clean-up operation. Because the district court lacked jurisdiction under 28 U.S.C. § 1451, it transferred the case to the United States Claims Court. *Wright v. United States Dept. of Agric.,* No. 86–3171, 1987 WL 13756 (E.D.Pa. July 14, 1987). In *Wright v. United States,* 14 Cl.Ct. 819, 824 (1988), this court dismissed plaintiff's constitutionally-based due process, equal protection, and takings claims for lack of jurisdiction. At that time, this court concluded that the appraisal regulations at 9 C.F.R. § 53.3(b) and 9 C.F.R. § 81.14 (1984) were to be considered together in reviewing the Secretary of Agriculture's determination of the fair market value of plaintiff's flock. Read together, these statutes mandated that plaintiff's flock be evaluated on the basis of the flock's "fair market value ... determined by meat, egg production ... or breeding value ..." at the time of its destruction. 9 C.F.R. §§ 53.3, 81.14 (1984).

In December of 1988, defendant instructed its expert to re-appraise plaintiff's flock on proper statutory grounds, *i.e.,* on the basis of the flock's breeder value. Defendant's expert complied as well as he could, although he expressed the opinion that it was impossible to accurately re-evaluate the flock on different grounds so many years later. Defendant's expert did, however, provide a figure which he testified at trial represented re-appraisal of plaintiff's entire flock as breeder birds.

On March 10, 1989, this court, mindful of the December, 1988 re-evaluation, remanded the evaluation again to the Secretary for yet a third evaluation. Because expert testimony during discovery had produced estimates ranging from $33,025.44 to $110,130.00, the remand order directed the Secretary to consider the opinions of all expert testimony provided to the government through discovery, as well as any other expert or experts the Secretary wished to consult. On April 14, 1989, the Secretary issued its third evaluation. USDA stated that it had considered all the evaluations produced through discovery as well as the evaluation of another expert retained for purposes of complying with this court's order. The third evaluation found that the government's original evaluation was the most fair since that expert had actually

seen the flock closest to the time of its destruction. To that expert's original figure of $33,025.44, the Secretary added $1,340.00 which represented that expert's December, 1988 re-evaluation of plaintiff's flock allegedly based on proper statutory grounds.

The parties continued to trial on the following issues: 1) whether the Secretary of Agriculture's evaluation of plaintiff's flock was arbitrary, capricious, an abuse of discretion or contrary to law; and 2) whether defendant was liable under the statute to compensate plaintiff for damages done to plaintiff's property during the cleaning and disinfecting operation.

## DISCUSSION

■ Although this court can exercise judicial review of the Secretary of Agriculture's decision as to the fair market value of plaintiff's flock, that judicial review is not *de novo*. Therefore, plaintiff must prove that "the administrative computation, as applied to it, was arbitrary, capricious, an abuse of discretion, or contrary to law." *Julius Goldman's Egg City v. United States*, 556 F.2d 1096, 1099, 214 Ct.Cl. 345 (1977), *cert. denied*, 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983) (cited as *Egg City I*).

> [I]n a case like this, the Department [of Agriculture] does not have discretion whether or not to pay nor can it decide for itself that something other than "fair market value" shall be awarded.... [T]he measure of fair market value shall be "as determined by the Secretary." Those words ... go to show that ... the court cannot substitute its own discretion for properly exercised administrative discretion. But the language does not carry the further burden of making the Secretary's exercise of his discretion conclusive even though he abuses it, acts arbitrarily or capriciously, or fails to follow the statutory standard by refusing to grant a reasonable fair market value.

*Id.* (quoting 21 U.S.C. § 134a(d)).

### I. Evaluation of Plaintiff's Flock

Defendant argued that the Secretary of Agriculture acted entirely within the authority provided by 21 U.S.C. § 134a. Defendant proposed that after declaring that an emergency existed, the Secretary properly exercised his authority to promulgate regulations to enable the USDA to control and eradicate avian influenza. *See* 9 C.F.R. §§ 81.1–.15 (1984).

The initial disputed issue that arose was whether 9 C.F.R. §§ 81.1–.15 represented the controlling regulations for the purposes of this action. This court answered that question in *Wright v. United States*, 14 Cl.Ct. 819, 823–24 (1988). This court held that both 21 U.S.C. § 134a and 9 C.F.R. §§ 81.1–.15 should be read in conjunction with 21 U.S.C. § 114a and 9 C.F.R. §§ 53.-1–.10. *Wright*, 14 Cl.Ct. at 823–24. In that earlier decision, this court focused primarily on whether there were grounds for granting summary judgment.

Defendant argued that the legislative history of section 134a supported its contention that the use of the term "fair market value" in the statute meant that Congress had intended the specific, settled and well-known legal meaning of that phrase. Further, defendant contended that case law supported its contention that section 134a was distinct from section 114a and, therefore, fair market value had a distinct meaning under section 134a without regard to other laws.

### A. The Proper Statutory Basis

The basic form of compensation to owners of livestock destroyed at government order, contained in 21 U.S.C. § 114, was first enacted into law on May 29, 1884 as chapter 60 section 3, 23 Stat. 32 (1884). Section 114a, which provides for the payment of claims to the owners of poultry destroyed by the government through a government effort to eradicate communicable diseases, was first added to this law on September 21, 1944. 21 U.S.C. § 114a (1982). Later, because "[e]xisting basic authority (act of May 29, 1884, as amended) provides for payment of claims for the destruction of animals and poultry affected by or exposed to diseases, but makes no provision of payment for the destruction of

material affected by or exposed to such diseases," Congress expanded section 114a on August 3, 1956 to include payment for those materials destroyed pursuant to a government mandated eradication program. H.Rept. No. 2732, 84th Cong., 2d sess (1956). Gaps that remained in the statutory scheme were addressed by Congress in 1962 when Congress enacted 21 U.S.C. § 134, to wit:

> The general effect and purpose of this bill is twofold: (1) To extend to all communicable diseases of livestock and poultry, authority of the Secretary to deal with emergency situations arising from outbreaks of such diseases, such as he now has with respect to specific diseases in numerous separate laws; and (2) to charge the Secretary of Agriculture with the general duty and responsibility of preventing the entry or dissemination of communicable diseases of livestock and poultry, so that he may take action before an emergency arises.

H.Rept. No. 1518, 87th Cong., 2nd sess (1962). The Senate report likewise states that:

> The bill . . . is designed to close a number of gaps which have shown up in the animal quarantine laws and to clarify authority for certain actions under such laws. Those laws have been enacted from time to time to meet particular situations. They are applicable to specific animals, diseases, or circumstances, and fail to cover, or provide different authority with respect to, other animals, diseases and circumstances where there is a need for uniform, broad authority. The bill is designed to provide such authority for all cases of like need. . . .
>
> The bill would increase the Secretary's seizure authority; clarify his authority to restrict imports; increase authority for inspection and for sanitary regulations, and provide injunction authority. The purpose of the bill is to provide adequate safeguards for the protection from disease of our domestic livestock and poultry industry.

S.Rept. No. 582, 87th Congress, 1st sess (1961).

The language of section 134a is clear that "the statute's purpose is to give the Secretary continuing authority for disease control and eradication . . . allowing him to take swift action to eliminate the inherent dangers of contagious livestock diseases." *Egg City I,* 556 F.2d at 1100. Defendant, therefore, argued too broadly that this section provided the only statutory authority under which the Secretary acted in this emergency. Defendant pointed to no language in the statute itself or in the legislative history, nor can this court find any such language, supporting defendant's assertion. In addition, this court finds that even though the Secretary's authority under section 134a is extraordinary, congressional intent is clear that "the purpose of the indemnity is . . . to engender owner cooperation with the Secretary's efforts." *Id.* Accordingly, section 134a does not allow the Secretary to act in those states where "adequate measures are . . . being taken by the State or other jurisdiction." 21 U.S.C. § 134a(b) (1982). Furthermore, whatever the circumstances, the Secretary is required to "notify the appropriate official of the State or other jurisdiction before any action is taken in any such State or other jurisdiction pursuant to this subsection." *Id.* The requirements, therefore, relate the Secretary's actions pursuant to section 134a back to the clear congressional purpose of engendering cooperation as stated in section 114a.

■ The evidence presented to the court clearly showed that the beginning stages of this emergency were accomplished under 21 U.S.C. § 114a, not 21 U.S.C. § 134a. The Secretary's authority and power under title 21 U.S.C. § 134a did not become effective until the November 9, 1983 declaration that an emergency existed and that the state of Pennsylvania was unable to meet the threat. By November 9, 1983 when the Secretary was first able to invoke his extraordinary powers enumerated in section 134a, plaintiff was already voluntarily cooperating under the PDA's quarantine and only after that November declaration could the USDA and PDA roles reverse. Indeed, the USDA's first action was to promulgate regulations in harmony with already exist-

ing PDA quarantines. It would therefore be unreasonable as well as contrary to discernable congressional intent if the voluntary cooperation with government authority begun under one statute (section 114a) were to be totally ignored and disregarded by the Secretary of Agriculture's subsequent actions under a later statute (section 134a). Therefore, we hold that the actions taken by the Secretary in this case which did not engender the cooperation of the state or local jurisdiction involved or the cooperation of the owners of the poultry that was to be destroyed were contrary to congressional intent expressed in the narrower, applicable section 114a; therefore, these actions were arbitrary, an abuse of discretion, and contrary to law.

■ Defendant also argued that "fair market value," legally defined as the amount a willing buyer would pay a willing seller, was limited by Congress' later use of those words in enacting the Secretary's broader powers under section 134a. However, upon examination, defendant's argument fails for three reasons. First, reading the statutes and regulations as defendant argues would be contrary to congressional intent as arbitrarily limiting the compensation due plaintiff to the legal definition of fair market value might not induce the cooperation of farmers with the government mandated destructions. The facts of this case clearly show that plaintiff would never have cooperated with the USDA at all in its attempts to eradicate avian influenza, much less allow the USDA to destroy his flock, had plaintiff known the apparently nominal amount of compensation he would eventually be offered in compensation for the destruction of his flock. Implicit in plaintiff's grudging cooperation with the USDA's efforts was his belief that he would be treated fairly by the government and receive what he considered adequate compensation for the damages done pursuant to the USDA's actions. Second, the language of the statute itself does not limit the compensation to the legal term of art of fair market value. *See*

*Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1559 (Fed.Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989); *Wright,* 14 Cl.Ct. at 822–23.[4] Third, as pointed out in this court's earlier order, the regulations of section 114a (enacted in 1956) determine fair market value more narrowly than the later regulations of section 134a (enacted in 1962) by specifically defining the basis for a fair market value determination. Therefore, the general language of the regulations of section 134a can not properly be interpreted as defining fair market value more narrowly than the specific language in the regulations of section 114a.

■ Defendant's last argument was that the legislative history does not foreclose USDA's interpretation of the statute and that USDA's interpretation is reasonable and therefore must be upheld by the court. *See Chula Vista City School Dist. v. Bennett,* 824 F.2d 1573, 1582 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 861 (1988). We hold, however, that the clear intent as shown by the congressional history does not support defendant's argument. This holding is consistent with other courts' determinations that the purpose of the indemnity regulation was "to encourage owners of infected or exposed poultry to destroy their birds, thereby reducing the spread of the disease." *Empire Kosher Poultry, Inc. v. Hallowell,* 816 F.2d 907, 914 (3rd Cir.1987); *see also Egg City I,* 556 F.2d at 1100. In addition, this court's determination is consistent with the Supreme Court's conclusion that fair market value, as limited to its legal definition, may not always be appropriate.

The Court therefore has employed the concept of fair market value to determine the condemnee's loss. Under this standard, the owner is entitled to receive "what a willing buyer would pay in cash to a willing seller" at the time of the taking. *United States v. Miller,* [317

---

**4.** This does not suggest that the legal definition of fair market value can never be sufficient

under section 53.3(b).

U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943).] ... [T]he concept of fair market value has been chosen to strike a fair "balance between the public's need and the claimant's loss" upon condemnation of property for a public purpose. *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402 [70 S.Ct. 217, 221, 94 L.Ed. 195] (1949)....

But while the indemnity principle must yield to some extent before the need for a practical general rule, this Court has refused to designate market value as the sole measure of just compensation. For there are situations where this standard is inappropriate.

*United States v. 564.54 Acres of Land*, 441 U.S. 506, 511–12, 99 S.Ct. 1854, 1857, 60 L.Ed.2d 435 (1979) (supplemental citations omitted).

However, the full thrust of defendant's argument cannot be disposed of this easily. Defendant further argues that, since this is USDA's determination of its own regulation, great deference must be afforded that determination. *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). As a general proposition, defendant's assertion holds true. However, where the agency determination is contrary to clear congressional intent, the "judiciary is [to be] the final authority...." *Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9. Moreover, defendant's argument is flawed because the Department of Agriculture has not limited its own use of the two statutes in combination to this "legal definition" of fair market value. *See Julius Goldman's Egg City v. United States*, 697 F.2d 1051 (Fed.Cir.), *cert. denied*, 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983) (cited as *Egg City II*).[5] This court finds, therefore, that the combination of: 1) the congressional intent to encourage those injured by government destruction to assist the government in its greater effort to eradicate the disease by fair compensation, 2) the consistent findings of courts that fair market value, notwithstanding the fact

that it has a settled legal meaning, cannot mean a value that fails to provide adequate compensation, and 3) the Secretary of Agriculture's earlier actions under these same statutes, described in *Egg City I* and *Egg City II*, makes it impossible for this court to find the Secretary's actions in the present case reasonable. Therefore, defendant's argument fails and the court need not and will not give deference to the agency's determination of fair market value in the present action.

**B. The Determination of Fair Market Value**

■ The next question this court must answer is whether the regulations at 9 C.F.R. §§ 53.3 and 81.14 (1984), applicable to this case, were properly administered by the Secretary of Agriculture. The facts presented at trial unequivocally showed that both defendant's and plaintiff's on-site experts were instructed by an unknown USDA official to evaluate plaintiff's flock not on any statutorily recognized basis but as exhibition birds. The applicable regulations would have required fair market value to be determined "at the time of destruction" of the flock, 9 C.F.R. § 81.14 (1984), and "by the meat, egg production ... or breeding value" of the flock. 9 C.F.R. § 53.3(b) (1984). Nowhere in the statutes, sections 114a or 134a, nor the implementing regulations, 9 C.F.R. §§ 53.3 and 81.14, were there any instructions for evaluating poultry on the basis of its exhibition value. Therefore, the Secretary of Agriculture did not properly administer the applicable regulations in this case.

Furthermore, the Secretary's actions were contrary to congressional intent. As this analysis has shown the legislative purpose of section 134a was to give the Secretary of Agriculture extraordinary powers to act when necessary to protect the poultry industry. In order to encourage breeders who would be injured by the government's emergency actions to assist the government in its objectives to restore the

5. In *Egg City II*, the Court of Appeals for the Federal Circuit held that it was proper for the Secretary to even include a measure of profits

in determining a fair market value compensation. *Egg City II*, 697 F.2d at 1055.

industry to its former place as quickly as possible, the Secretary was mandated by Congress to compensate the farmers for their loss. If the compensation offered by the Secretary were inadequate, however, the Secretary would obviously face opposition to his actions, there would be unwarranted delay in restoring the breeders and the industry to its former place, and congressional intent would not be served.

 Finally, the statutory language quoted above did not, as defendant asserted, limit compensation to a ceiling price equal to the generally acceptable legal term of art "fair market value." Instead it set that value as a minimum basis for compensation. Although defendant was correct in stating that the concept of fair market value was one well recognized in law and that the use of that term in the statute suggested that Congress meant the legal term of art, defendant is not saved from following the entirety of the statute's mandates which include section 114a where the specific grounds for evaluation are enumerated. Because the USDA did not evaluate plaintiff's flock on the basis of their egg, meat or breeder value, it was therefore necessary for the court to determine the factual question as to what constituted "fair market value" for a poultry breeder in plaintiff's circumstances under the applicable law. There was much evidence presented at trial on this issue by expert testimony, applicable court precedent and the Secretary's prior actions. This evidence focused on three elements to be considered in determining "fair market value" for plaintiff's birds: 1) the base reparation cost; 2) transportation costs; and 3) progeny value and lost profits.

### 1. Base Reparation Cost

A range of values for plaintiff's flock, from a low of $33,025.44 to a high of $113,631.75, was provided to this court by a total of six expert witnesses, two for plaintiff and four for defendant. The lower values, falling within a range of $33,025.44 to $45,329.50, were provided by defendant's experts. Testimony suggested this range of values might be consistent in that it represented reasonably differing values that individual judges might provide when looking at the same birds. Plaintiff's experts provided valuations of $110,130.00 and $113,631.75. The discrepancy between the two ranges was due to plaintiff's experts including transportation costs as part of their valuation while defendant's experts limited their valuations to the price a willing buyer would pay a willing seller, or the legal term of art definition of fair market value. It has already been shown that under the facts of this case, this legal term of art limitation was faulty. It remains for the court, however, to determine the proper base reparation cost of plaintiff's flock. Transportation costs have two components: 1) the cost of finding a suitable replacement bird, including reasonable transportation costs necessary to travel to and from a particular location to see the bird for purchase; and 2) the actual cost of shipping the bird from the seller to the buyer. Testimony showed that this last component can be substantial.

The defense experts' re-evaluations of plaintiff's flock on proper statutory grounds, *i.e.*, as breeder birds, following this court's remand order of March 10, 1988, produced greater harmony in their final figures. Mr. Bortner, defendant's original appraiser, re-evaluated plaintiff's flock and increased the value of his earlier evaluation to $34,365.44. The Secretary determined that because Mr. Bortner had actually seen the flock just before its destruction, and neither plaintiff's experts nor the Secretary's remand experts had seen plaintiff's flock for several years if at all, Mr. Bortner's testimony was the most credible in arriving at a fair market value of plaintiff's flock. While the Secretary's conclusion appears reasonable, Mr. Bortner's testimony and demeanor at trial left this court in great doubt as to whether he actually re-evaluated plaintiff's entire flock or merely appeased the Secretary by raising the value of a few birds. His reappraisal letter to the Secretary cast considerable doubt on his re-evaluation. It stated:

Having reviewed the enclosed file on my initial appraisal of the Avian Flock of

Mr. Fred Wright, on July 7, 1984, I find very little that I can honestly re-appraise.

As stated on all the forms carrying my signature, the "Value was based on Market Value of *EXHIBITION* Poultry...."

I can not [sic] in all sincerity, evaluate any of these birds ... as breeders.... I personally do not think anyone can do that.

Letter from B.R. Bortner to USDA (December 27, 1988) (emphasis in original). Mr. Bortner's testimony at trial was conflicting on this point, although in the end he asserted that he did indeed evaluate all of the birds as breeders. The inconsistency in his testimony on two different days and his final assertion that he did evaluate the whole flock as breeders combined with his inability to explain the plain meaning of his letter written at the time of his re-appraisal, persuaded the court to discount his testimony on this issue. The court was simply not convinced that Mr. Bortner ever evaluated plaintiff's entire flock on proper statutory grounds.

Two other defense experts, Mr. Arthur Schallenberg and Mr. John Wunderlich, agreed with Mr. Bortner's evaluation. Mr. Schallenberg served as plaintiff's expert at the original evaluation of the flock. While this would appear to lend credibility to Mr. Schallenberg's evaluation, at trial it became clear that Mr. Schallenberg had not valued plaintiff's flock on July 7, 1984 as breeders nor had he ever evaluated plaintiff's flock for their breeder value. In addition, Mr. Schallenberg testified that at the time of evaluation he could see no greater value in the flock as breeders than as exhibition birds. This testimony was inconsistent with the testimonies of other experts which the court found more credible.[6] The testimonies of the other experts who agreed on these latter points were very convincing to the court. Because Mr. Schallenberg's testimony was inconsistent with other credible expert testimony, the court discounted his contradictory testimony. Mr. Wunderlich, who did not testify at trial, was retained by the Secretary after the court had remanded the valuation decision to the Secretary. Mr. Wunderlich deferred heavily to the opinions of Mr. Bortner and Mr. Schallenberg in his written evaluation of plaintiff's flock because those experts had seen plaintiff's flock within a month of its destruction. Like defendant's other witnesses, there was little evidence, if any, showing that Mr. Wunderlich ever evaluated plaintiff's flock independently on their value as breeders. Also, because of the lack of credibility of Mr. Bortner's and Mr. Schallenberg's evaluations which served as the basis for Mr. Wunderlich's evaluation, the court cannot accept Mr. Wunderlich's opinion as a basis for a fair market valuation.

The only defense expert who testified unequivocally that his evaluation was done on the basis of plaintiff's flock being breeders was Dr. John L. Skinner. Dr. Skinner was retained by the Secretary as an expert pursuant to this court's March 10, 1989 remand order. Dr. Skinner did not testify at trial. The quality of his written testimony, however, was quite apart from defendant's other experts. Defendant's other experts' testimonies were very confused, leaving the court wondering whether a fair evaluation on the proper basis was or could have been done at any time. The testimony of Dr. Skinner, on the other hand, provided the court with valuation figures from which an accurate assessment could be made. Dr. Skinner displayed independent understanding of the breeder industry and the condition of plaintiff's birds at the time of their destruction. His testimony was clear and unequivocally showed that he evaluated plaintiff's flock on the basis of their breeder value and determined that the

6. Defendant also argued, and testimony provided, that in the industry exhibition birds and breeder birds can mean the same thing as exhibition birds represent the best product of a breeder's output and may be used, after exhibition, to breed more poultry. The court was persuaded, however, that this was not true in plaintiff's situation as expert testimony convincingly demonstrated that an evaluation of plaintiff's flock as breeder birds would be substantially higher than an evaluation of plaintiff's flock as exhibition birds. Oftentimes non-exhibition birds produce the best exhibition birds and, conversely, exhibition birds do not necessarily produce exhibition birds.

fair market value of Mr. Wright's flock at the time of its destruction was $45,676.50. Because of his forthrightness and expertise, the court accepted in part Dr. Skinner's evaluation as a basis for determining fair market value. His evaluation, which did not include transportation costs that he testified should be included in a final fair market valuation, was useful and instructive to the court. *See* Letter from Dr. John L. Skinner to USDA (March 23, 1989).

### 2. Transportation Costs

Defendant argued most strenuously that the law does not require compensation of transportation costs incidental to a breeder's repopulation of his flock. The court is convinced, however, that had the Secretary properly evaluated plaintiff's flock in July, 1984 as breeder birds, then transportation costs would have suggested themselves as a necessary element of the fair market value compensation due plaintiff. The majority of expert witnesses at trial, both for defendant and for plaintiff, agreed that they expected transportation costs to be paid in these circumstances. Mr. Bortner, defendant's primary expert, said: "I would expect the Government to pay it all." Tr. at 396. Dr. Skinner, another defense expert whom the court found highly credible, stated in his letter that one of the factors to be considered above and beyond the cost of similar replacements was the "[t]ransportation of those replacements to Mr. Wright's premises." Letter from Dr. John L. Skinner to USDA (March 23, 1989).

Plaintiff's experts included transportation costs as necessary costs in their valuations of plaintiff's flock while defendant's experts did not. The person apparently most responsible for defendant's confusion on this issue was Dr. Lonnie King, the Deputy Administrator for Veterinarian Services for the Department of Agriculture in charge of the avian influenza eradication program. This confusion was evidenced in the following conversation between the court and Dr. King.

THE COURT: During your testimony, you actuated [sic] fair market value as being replacement costs. I believe that you said and this is probably not a direct quote, "Fair market value would be the amount of money that Mr. Wright could repopulate his flock with." Is that an accurate statement?

THE WITNESS: With equal type of bird with equal quality.

THE COURT: Okay. But, then, you went on to say that would not include transportation. This is a quote. "It is part of the fair distribution system between buyers and sellers." Now, is that inconsistent?

THE WITNESS: I do not think that it is, Your Honor. I think that market value is what I defined it as getting the birds back and forth to people. It is just my judgment that was not inconsistent.

THE COURT: In other words, Mr. Wright could repopulate his flock as long as he left the flock with the seller, but he could not bring it to Pennsylvania, is that correct?

THE WITNESS: He would have to bring it to Pennsylvania.

THE COURT: Oh, you are going to have to make up your mind now. Are you going to pay him the transportation cost and let [him] repopulate his flock or are you going to make him have a smaller flock? Someone has to pay the transportation cost. Now, if you say that the fair market value is the replacement cost of that flock, then, do you have to include transportation [in] fair market value?

THE WITNESS: I just do not think so. I understand your reasoning, but that seems to be the part of doing business. People buy and sell birds, livestock, all of the time.

THE COURT: Yes, but the Department of Agriculture here destroyed his flock. They are mandated to pay him the fair market value. You said that fair market value is the replacement cost. The replacement cost must include transportation, should it?

THE WITNESS: I do not think so, Your Honor.

THE COURT: You keep saying that, but you will not tell me why?

THE WITNESS: Because, I do not think that is part of the value.

THE COURT: Well, how does Mr. Wright replace his flock with the same number of birds and the same quality based upon your definition of fair market value?

THE WITNESS: I am assuming that under those circumstances, he would pay for the transportation.

THE COURT: How can you say that?

THE WITNESS: It is not part of the fair market value....

THE COURT: I have lost the logic of replacement as being fair market value, but not really being able to replace the birds you cannot afford to ship ... to your farm ... the reason being that the Government destroyed your birds and refuses now to give you enough money to rebuild your flock?

THE WITNESS: I just [see] them as two different indemnities. One [is] fair market value that we talked about in the appraisal, and one is the transportation cost, that I just have not connected in one indemnity.

THE COURT: Tell me how he rebuilds his flock, then? I will repeat that question.

THE WITNESS: You go through the appraisal value. You have to find these birds and pay for them, and your point is and I think that is the fair market value of those birds. Your point is, how do you get them from point A to point B to his premises? I assume that has been the cost borne by Mr. Wright or whoever.

THE COURT: Who caused that cost?

THE WITNESS: Who caused the Avian Influenza?

THE COURT: No, who caused the cost, the transportation cost in rebuilding Mr. Wright's flock?

THE WITNESS: We depopulated his flock. If he is going to go back into business, obviously, that is directly related to his depopulation.

THE COURT: So, it is the Department of Agriculture's fault, in a sense. Not guilt, but the Department of Agriculture caused that cost to be raised as a factor....

I do not know if you ever told me what fair market value was?

THE WITNESS: It is the replacement of that bird of equal quality, same breeding.

THE COURT: But, none of the costs of making sure that it is the same bird and the same quality, none of the costs—

THE WITNESS: The same quality. Not the cost of getting it there.

Tr. at 571–76. Dr. King was authorized by the Secretary of Agriculture to determine the fair market value of plaintiff's flock. It is obvious that Dr. King arbitrarily and perhaps capriciously decided that transportation costs should not be included in a fair market valuation. Based on the clear weight of expert evaluations and opinions, the court found that these actions were not reasonable. Transportation costs should have been included at least in the circumstances of this case as part of the Secretary's determination of fair market value to repopulate plaintiff's flock of breeder birds. For a breeder of specialty poultry, especially one who is developing bloodlines and keeping particular breeds alive, credible testimony at trial showed that transportation costs can vastly exceed the price of a particular bird, even a rare bird. Plaintiff provided the expert testimony of two witnesses as to these transportation costs. Mr. Hans Schippers, a breeder from Holland, provided testimony which was, in general, most instructive and helpful to the court. But, it was evident that Mr. Schippers provided European market values for replacing and transporting plaintiff's flock, not United States market costs. Because there is no way for this court to determine what Mr. Schippers' figures might be in the United States market, the court rejected his figures as a basis for fair market value. However, his testimony concerning 1) breeder value as opposed to exhibition value, 2) plaintiff's flock and reputation in Europe, and 3) his opinion that transportation costs should be paid because of the great discrepancy in costs between replacement and transportation were very helpful to the court.

The testimony of Dr. Charles Wabeck, plaintiff's other expert witness, was also highly credible and instructive. His evalu-

ation added to the United States prices of replacing plaintiff's flock the costs of transportation, which include both the reasonable costs necessary for Mr. Wright to travel to and from particular breeders to evaluate specific birds and the costs of transporting those suitable birds when found to plaintiff's place of business. Although on their face the disparity between the evaluation figures of Dr. Skinner ($45,-676.50) and Dr. Wabeck ($110,130.00) appear irreconcilable, after studying the record as a whole, the court was convinced that the difference is wholly attributable to transportation costs. Dr. Wabeck's expert evaluation, which provided evidence of the substantiality of these transportation costs, confirmed this finding.

Although USDA had three expert evaluations, it never asked any of the experts retained for an evaluation of transportation costs. Even after this court remanded the evaluations back to USDA, directing it to re-evaluate the flock on the basis of all the expert testimony produced during discovery and in which plaintiff's experts had discussed the necessary inclusion of transportation costs, and even after Dr. Skinner, the Secretary's own independent remand witness that this court found so credible, told USDA that transportation costs should be considered, the Department made no evaluation of transportation costs.

At trial, instead of refuting plaintiff's transportation cost claims, defendant's experts agreed with plaintiff's assertion that transportation costs must be included in a breeder bird evaluation. Therefore, this court accepted the testimony it had received on the subject from plaintiff's expert, Dr. Wabeck. His valuation of Mr. Wright's flock at $110,130.00 included transportation costs as well as the cost of replacing the birds themselves. Accordingly, the court accepted the only credible testimony of both plaintiff's and defendant's experts in determining the reparation and transportation costs of plaintiff's flock: $45,676.50 as the naked value of plaintiff's birds, as concluded by defendant's expert Dr. Skinner, and $64,453.50 as the necessary transportation costs for plaintiff's particular flock, as determined

by plaintiff's expert Dr. Wabeck. The total sum for these two elements of fair market value equals $110,130.00.

### 3. Progeny Value and Lost Profits

■ Plaintiff also claimed that progeny value and lost profits should have been included as elements of the fair market valuation of his flock. Plaintiff asserted that because the government quarantine disallowed any movement of poultry within the quarantined area, plaintiff was denied profits for the period of time in which plaintiff was prevented from doing business because of the government quarantine. Plaintiff requested damages in lost profits from the sale of birds that would have been produced from November, 1983 through June, 1985. Plaintiff further asserted damages in lost progeny of those breeds destroyed by the government ordered depopulation from June, 1985 onward. In sum, plaintiff claimed damages in lost profits for one selling season for his entire flock and damages in lost progeny for the remainder of his working lifetime. Defendant responded by arguing that plaintiff was not entitled to any lost profits under the statute, that there were no established bloodlines of either plaintiff or Mr. Miller, and that progeny value was too speculative to merit award.

As to plaintiff's lost progeny claims, plaintiff failed to overcome the threshold inquiry: whether the birds destroyed were in fact irreplaceable. Plaintiff's expert witness, Dr. Wabeck, testified that he "cannot say for certain whether a bird is irreplaceable or not...." Tr. at 161. In contrast, all of defendant's experts not only provided replacement values for all the birds destroyed, they all testified without equivocation that, in the words of Dr. Skinner, all of plaintiff's birds "could have been replaced ... in August of 1984 assuming a quality level suitable for ... breeding...." *See* Letter to USDA from Dr. John L. Skinner (April 3, 1989); *see also* Testimony of Burnell Bortner, Tr. at 438–39. Therefore, plaintiff's extended claim for progeny value for twenty-seven years was inappropriate.

Plaintiff also sought lost profits. He asserted that because the Secretary had earlier included profits as part of the fair market value measurement in *Egg City II*, it would be unreasonable for the Secretary to deny plaintiff profits in these similar circumstances. We are persuaded that plaintiff was entitled to some inclusion of a measure of profits in the fair market valuation of his flock because expert testimony at trial established lost profits as one of the elements necessary to a fair market valuation. This testimony was consistent with our findings that the unique nature of plaintiff's business as a poultry breeder was recognized in the regulation and that such compensation would be necessary to further the already identified congressional intent of encouraging all poultry farmers to cooperate with statutorily authorized government action. This finding is further consistent with the Secretary's own previous actions under these same statutes in the similar *Egg City* case where the Secretary not only included a measure of lost profits in his determination of fair market value but increased that measure when he determined such action necessary "in order to pay full compensation for the destroyed chickens." *Egg City II*, 697 F.2d at 1056.

Expert testimony at trial supported including lost profit compensation in the determination of fair market value for breeders of poultry. For example, Mr. Bortner, defendant's primary expert, in response to a hypothetical based on the facts of this case said, "I feel I should be reimbursed [for lost profits]." Tr. at 403. Even defense expert Schallenberg agreed. Tr. at 479–80.

Testimony presented to the court also conclusively showed that plaintiff's lost profits as a breeder were different than the lost profits experienced by meat or egg producing poultry farmers. For example, egg producing poultry farmers can readily enjoy profits soon after the replacement of their flocks, while a poultry breeder cannot. A poultry breeder derives profits not from the sale of the replaced bird for meat or from its quickly produced eggs, but instead from the sale of new breeder birds produced from existing mature breeder birds. Therefore, a breeder's operation is not replaced by merely paying for the replacement of the breeders alone as the USDA attempted in this case. Testimony established that the period of time necessary for a poultry breeder to be in a position to make profits from his breeding operation is the well-known and well-defined breeding season. Expert testimony further showed the breeding season to be from late winter through mid-summer,[7] depending on the breed, and that plaintiff's main selling season was from late spring to the end of summer. Plaintiff was under USDA quarantine from its inception in November of 1983 through the destruction of plaintiff's flock in July of 1984 until the quarantine was finally lifted in June of 1985.

For the Secretary to refuse to include some compensation for lost post-depopulation profits is contrary to congressional intent because that would not encourage poultry breeders to cooperate with necessary government disease eradication actions. Including lost profits as an element of fair market value is consistent with the finding of the Court of Appeals for the Federal Circuit under similar circumstances in the already mentioned *Egg City II* which involved the same statutes at issue as in the present action. In *Egg City II*, the Court of Appeals upheld the Secretary's discretion to include a measure of lost profits under these same statutes. *Egg City II*, 697 F.2d at 1055–56. This court finds that had the Secretary properly evaluated plaintiff's flock for its fair market value as breeders, the Secretary would have included a measure of lost profits in its determination; the Secretary's denial of lost profits in the present circumstance was therefore at least arbitrary.

---

**7.** When the court refers to "breeding season," it means the entire period of time per year during which eggs are hatched. A hatching period is a subset of the larger breeding season in which a bird produces eggs that hatch. Therefore, as the court has defined it, many breeds could have more than one hatching period within a breeding season.

At trial, defendant did not present evidence as to what would be a proper amount of lost profits should the court award them. Instead, defendant merely reiterated that plaintiff was not entitled to progeny value or lost profits under section 134a. The only testimony provided this court in terms of determining the proper amount of lost profits came from plaintiff's expert witness, Dr. Wabeck, and from plaintiff himself. Plaintiff's formula took a three-year average of chicks produced per bird from plaintiff's hatchery and rounded that number to the nearest whole number to represent the number of chicks expected per bird per hatching period for the breed in question. Plaintiff's formula then multiplied that average by plaintiff's stated 1984 catalogue price for a chick of that breed and age. This figure represented the total amount of money plaintiff could expect to receive for those chicks produced by that bird of that particular breed. Plaintiff then determined from an examination of his business profit and loss statements that approximately one-half of that amount represented the cost of production and, therefore, one-half of the total value was subtracted to off-set production costs. The resulting figure represented the amount of profit plaintiff expected per bird per breed per hatching period. Extending these figures to represent the entire breeding season showed plaintiff's lost profits to be $204,828.41.

In addition, plaintiff had added to this figure the "raw value" of each bird. Because those breeder birds are replaced, it would represent a double recovery to include the "raw value" figures here.[8] To arrive at the proper lost profits compensation figure, therefore, the court subtracted plaintiff's raw value totals from plaintiff's lost profit totals, consistent with plaintiff's

formula, and arrived at the figure of $204,828.41. Therefore, $204,828.41 represents the statutorily recoverable profits plaintiff lost for one year.

As the evidence showed, however, plaintiff was out of business for two post-depopulation selling seasons. Following the flock's destruction in July of 1984, the USDA's quarantine on plaintiff's farms prevented plaintiff from returning to business until it was lifted in June of 1985. This USDA quarantine, therefore, caused plaintiff to effectively lose two breeding seasons, all of one selling season and much of a second selling season.[9] This is true because even if plaintiff had begun breeding poultry immediately after the quarantine was lifted, the 120–day maturation period would still have exceeded the 1985 selling season. In the earlier *Egg City* case, the Secretary based his lost profit indemnity on the amount of time following flock depopulation that it would take a breeder "to raise a chicken to profitable ... age." *Egg City II*, 697 F.2d at 1055. Accordingly, the court finds that plaintiff was entitled to the profits he would have enjoyed in the second selling season lost as a result of the USDA's not lifting the quarantine until the middle of the breeding season as well as the profits lost during the first season while under actual quarantine. The total post depopulation lost profit recovery due plaintiff is therefore $409,656.82.

## II. Damages to Property

■ Plaintiff's second claim is for $38,071.77 in property damages done by the USDA in cleaning plaintiff's premises. The parties expressly agreed that USDA would clean plaintiff's premises at the government's expense because plaintiff was financially unable to perform the

---

**8.** The court notes that even if these breeder birds producing the chicks were sold at the end of the breeding season for profit, that profit would still not be recoverable as plaintiff will now have the opportunity to do with the replaced breeder what he would have done with the destroyed breeder.

**9.** It is true that some of this damage was caused by the PDA quarantine from April, 1983 to No-

vember, 1983; but, plaintiff is not claiming damages arising during that time period in this action. Moreover, testimony at trial indicated that part of the delay in getting plaintiff back into business could be attributed to plaintiff as he was unable to clean his premises as required by statute. Regardless, defendant did not argue this point and the court can find no reason to take exception because of this delay.

clean-up himself and the delay in accomplishing this clean-up required the avian influenza emergency quarantine to continue long after the disease had been eradicated in all areas but plaintiff's two farms. The agreement between plaintiff and defendant governing the transaction gave defendant the right to dispose of those articles which in defendant's estimate could not be reasonably cleaned. Paragraph three of the parties' agreement provided:

> [The USDA's Animal and Plant Health Inspection Service (APHIS)] will attempt to clean and disinfect all nest boxes, partitions, drop boards, and other items. However, it is mutually understood and agreed that nest boxes, partitions, drop boards, and other items with rusted wire or metal or [rotted] wood [may] be disposed of if they cannot be readily cleaned and disinfected, as determined by APHIS.

Tr. at 499. At trial, the APHIS official in charge of the clean-up at both farms, Mr. Gene Longwith, testified that he did not believe that the government was liable to plaintiff for the property destroyed during the clean-up. Tr. at 521–30. However, this case is governed by specific regulations. *See* 9 C.F.R. §§ 53.5, 53.8, 81.12, 81.15 (1984). Both the implementing regulations of 21 U.S.C. § 114a and 21 U.S.C. § 134a provide for compensation for the value of material destroyed during a government ordered clean-up. 9 C.F.R. §§ 53.8, 81.15 (1984). Therefore, from the plain meaning of the statute, defendant is obligated to pay plaintiff the value of those materials destroyed regardless of who actually performed the clean-up.[10] Accordingly, plaintiff is entitled to receive the value of the materials destroyed during the clean-up. Factual questions remain, however, of what property was actually destroyed by the government pursuant to the agreement

and the value to be placed on that destroyed property.

Defendant argued that the property destroyed was minimal, offering supporting testimony of witnesses who were on the scene during the clean-up. They did not, however, convincingly contradict plaintiff's submission of photographic evidence and notes taken at the time of the destruction of plaintiff's property. This very convincing and largely undisputed evidence strongly supported plaintiff's assertion that the project was not closely managed by the government. The pictures showed tire tracks over knocked-down fences, various piles of materials outside buildings, and workers throwing material out of second-story windows onto the ground below. None of defendant's witnesses could positively assure this court that the damages plaintiff showed by photographic evidence and notes taken at the time of the clean-up did not occur at the hands of defendant. On the contrary, testimony presented by defendant showed otherwise. Miss Joyce I. Witt, the government Animal Health Technician working during the clean-up, testified that she did not destroy anything but that things might have been destroyed by other government agents during the clean-up. Tr. at 543–45. The testimony of Mr. Longwith, whose attention could not have been focused on two farms at all times, was not persuasive. When asked upon examination "how many people worked on the cleaning and disinfecting" he replied "[i]t was never the same number. The first day we had in the neighborhood of 18 people. We had 6 or 7 permanent federal employees and 10, 11, or 12 temporaries.... We never had the same number at any time." Tr. at 530. In addition, Mr. Longwith's testimony showed that many of these workers did not speak English and there were great difficulties in getting them to understand exactly what their jobs were. Tr. at 531.[11] The laxity of

10. Furthermore, Mr. Longwith, a party to the formation of the agreement, admitted at trial that there was no language in the agreement between the parties which specifically stated that defendant would not compensate plaintiff for items destroyed pursuant to the agreement. Tr. at 527.

11. Defendant also offered the testimony of Dr. Gerald Fichtner, director of the Avian Influenza task force. He described the condition of plaintiff's premises at the time of depopulation. These conditions were irrelevant, however, as the damages claimed by plaintiff arose out of the later government clean-up. Tr. at 483–87.

the operation as factually presented at trial, was not consistent with sufficient management supervision. The evidence presented was consistent, however, with plaintiff's assertions of damage.

One particularly large item of contention between the parties, representing $35,-000.00 of plaintiff's total $38,071.77 claim, involved the replacement of two 32h Robbins incubators. The court, as finder of fact, was not persuaded by plaintiff's testimony that these incubators were rendered unusable. Plaintiff offered evidence that before the clean-up there were five boxes of necessary replacement parts, including back-up thermostats and operating manuals, for the incubators in plaintiff's hatchery. During the clean-up, the boxes, containing these necessary materials, were apparently destroyed. Plaintiff argued that the lack of thermostats rendered the incubators unusable. Neither party presented expert testimony as to the value of the thermostats. Defendant offered testimony from Mr. Longwith that reed mercury replacement thermostats are readily available, along with operating manuals, at a cost of $562.50. Plaintiff replied that wafer-type thermostats were necessary for his machine and that neither his machine nor the necessary replacement parts for the incubators were made by anyone in this country anymore because the original manufacturer had been out of business for a long time and, therefore, no replacement parts were readily available. This, plaintiff explained, necessitated the $35,000 expenditure to replace the incubators.[12] Plaintiff, however, did not provide convincing testimony that he had made a thorough search for replacement thermostats and that none could be found at any location at any price.

The remainder of the items destroyed consisted of either normal items expected to be found on a poultry farm, from paper egg trays to wooden skids and metal waterers, or property destroyed by the clean-up, such as the driven-down fence. Plaintiff's witnesses more than convincingly established these damages at trial. The testimonies, photographic evidence, and general circumstances of chaos surrounding the clean-up operation, lead the court to find that plaintiff met its burden of persuasion on this portion of its property damages claim and is entitled to recover $3,071.77 claimed in property damages.

## CONCLUSION

The fair market value of plaintiff's flock should have been determined based on their value as breeder birds, as described and mandated by statute. Had the Secretary properly evaluated plaintiff's flock as breeder birds, he would have included repopulation costs including the purchase price of the birds, transportation costs, and post depopulation lost profits as necessary elements of his reasonable evaluation of "fair market value." By not so evaluating plaintiff's flock, the Secretary acted unreasonably and contrary to law. 21 U.S.C. §§ 114a, 134a (1982); 9 C.F.R. §§ 53.3, 81.-14 (1984). Plaintiff is entitled to $45,676.50 compensation for a base replacement cost of its flock, $64,453.50 compensation for transportation costs, and a lost profit compensation of $409,656.82 for two selling seasons, resulting in a total fair market value compensation of $519,786.82. Plaintiff has also prevailed on his statutorily prescribed property damages claim for $3,071.77 as a result of the clean-up of plaintiff's farms. Therefore, the total amount due plaintiff is $522,858.59. The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

---

**12.** Two functioning incubators are required, with one serving as a back-up to the other, to insure consistent incubation during the hatching process.