PER CURIAM.
 

 Appellant appeals from a judgment
 
 *
 
 of the United States Claims Court dismissing appellant’s petition. We affirm.
 

 The flocks in eight affected counties were appraised and destroyed, compensation was paid to the owners, and the approximately 160 ranches involved were cleaned and disinfected. This was done by a task force of 1500 persons, including veterinarians and agricultural economists, assembled from the Department of Agriculture’s Animal and Plant Health Inspection Service and the California Department of Food and Agriculture. The sum paid initially to all the owners, the initial indemnity, came to $17.7 million, and was supplemented by a further payment of $5.6 million, a total of over $23 million.
 

 I
 

 Appellant owned poultry which was destroyed on appellee’s order for the purpose of controlling an epidemic of an exotic poultry disease. The exotic disease, Velogenic Viscerotropic Newcastle Disease, first appeared in commercial poultry flocks in southern California in November, 1971. When the disease threatened to spread to the whole country, the appellee, through the Secretary of Agriculture (the “Secretary”), on March 14, 1972, acting with statutory authority, declared a national emergency and with the active collaboration of the California health authorities instituted a program to quarantine and destroy the infected flocks and pay the owners the fair market value of their destroyed flocks. 21 U.S.C. §§ 114-114a, 134-134h (1970);
 
 [1]
 
 9 C.F.R. §§ 53.1-53.10 (1975).
 
 [2]
 

 On September 7,1972, the appellee determined that appellant’s flock had been exposed to the disease. Appellant operated, in Ventura County, California, the largest egg ranch in the world. It housed some 3.4 million of the 11 million chickens destroyed, was 50 times larger than the average ranch, and three times as large as the next largest. Appellant was not only a table-egg enterprise which could produce 900,000 eggs daily, but, unlike other ranches, also had a feed mill, fertilizer plant, laboratories, facilities for breaking, drying and freezing eggs and storing the product, as well as a distribution system which took the eggs directly to retail supermarkets.
 

 The destruction of appellant’s flock and the cleaning and disinfection of its premises were completed on December 26, 1972. On February 1, 1973, the appellee permitted the appellant to begin bringing replacement
 
 *1054
 
 chickens back into its premises. Appellant was paid approximately $5.2 million as an initial indemnity and $2 million as a supplemental indemnity, a total of more than $7.2 million.
 

 In October, 1975, appellant filed a petition in the United States Court of Claims for additional payments of indemnities and for further payments under a contract with the appellee by which the appellant undertook the destruction of its flock and the cleaning and disinfection of its premises. The appellee moved for summary judgment which was denied by that court.
 
 Julius Goldman's Egg City v. United States,
 
 556 F.2d 1096, 214 Ct.Cl. 345 (1977). On remand, the lower court (then the trial division of the Court of Claims) dismissed appellant’s petition after a trial of the facts.
 

 Appellant now seeks review of the lower court’s decision. In addition, appellant seeks to recover interest on the amounts allegedly due and owing to it since 1972.
 

 II
 

 Appellant primarily argues that the trial judge incorrectly substituted his own standards of fair market value
 
 [3]
 
 for those standards enunciated and adopted by the Secretary. Appellant contends that the Secretary had enunciated and adopted standards for two separate indemnities and the trial judge incorrectly lumped the two indemnities together in a single sum as compensation for the fair market value of its destroyed flock. Appellant believes that the two indemnities should be considered separately — the initial compensation for fair market value of its destroyed flock and the supplemental compensation for lost profits until its flock could be replaced. We disagree. The trial judge correctly held that the two indemnities should be considered as a single total in order to decide whether the Secretary had made a proper determination of the fair market value of the destroyed chickens as required by statute and regulations.
 

 The appellant also contends that the sum of the two indemnities did not adequately compensate it for the fair market value of its destroyed flock. The statute provides that the Secretary “shall” compensate the owners of diseased animals, destroyed under the section; and that “[s]uch compensation shall be based upon the fair market value as determined by the Secretary, of any such animal * * * at the time of the destruction thereof.” 21 U.S.C. § 134a(d) (1970). The fair market value of chickens therefore “shall be determined by the * * * egg production * * * value of such animals.” 9 C.F.R. § 53.3(b) (1975).
 

 The Court of Claims has stated on numerous occasions and in particular in its denial of summary judgment in
 
 Julius Goldman’s Egg City, supra,
 
 at 1100-01, that the Secretary’s determination of fair market value
 

 [is] to be upheld unless it is found to have been arbitrary, capricious, an abuse of discretion, or violative of the statutory standard. * * * [T]he ultimate standard of decision here will not be the court’s own view of ‘fair market value’ but the propriety of the Secretary’s determination under the statutory criterion. * * * Plaintiff has the burden of demonstrating the correctness of its allegations.
 

 In assessing the propriety of the Secretary’s determination made pursuant to statutory authority, the reviewing court is guided by the
 

 venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong ....
 

 Red Lion Broadcasting Co. v. FCC,
 
 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969).
 
 See also First Multifund for Daily Income, Inc.
 
 v.
 
 United States,
 
 602 F.2d 332, 336 (Ct.Cl.1979),
 
 cert. denied,
 
 445 U.S. 916, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).
 

 
 *1055
 
 A similar standard has been established for the review of an agency’s interpretation of its own regulations, that is,
 

 to sustain an administrative interpretation of a regulation issued by it, it is not necessary to find that the agency construction is the only reasonable one, or even that it is the result a court would have reached had the question arisen in the first instance in judicial proceedings. * * * Where administrative control has been authorized by Congress, the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.
 

 Nabisco, Inc. v. United States,
 
 599 F.2d 415, 419 (Ct.Cl.1979).
 
 See also Udall v. Tallman,
 
 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). And, when the Secretary’s determination involves the exercise of administrative discretion, the review court must defer to his judgment as to where to draw the lines. The Court of Claims has previously observed in
 
 Nabisco, supra,
 
 at 422, that
 

 [a]ny such line would be open to criticism. This line-drawing, however, is precisely the task for which administrative agencies, with their special expertise and experience, are peculiarly suited to perform effectively; and it is in deference to that experience and judgment that courts refuse to disturb such determinations except when they are shown to be arbitrary. Here, the indicia chosen by the Secretary seem rational and appropriate, and afford a reasonable basis for the difference in treatment. * * * Even if the court itself might have drawn a different line had the matter been left to us, the Secretary’s action was clearly within the scope of discretion granted him by the statute.
 

 In its determination of fair market value, the Secretary found that there was no actual market for chickens of various ages in an egg rancher’s flock, but rather only a market for day-old chicks or 20-week-old pullets. In light of this fact, the Secretary concluded that $2.00 was a fair market value for an average prime-age 26-week-old chicken, the age an egg-laying chicken becomes profitable. This was calculated by adding the market price of $1.65 for a 20-week-old pullet to the 35-cent estimated average cost of raising such a pullet to 26 weeks. Although $2.00 was the maximum allowable compensation per chicken, that value was not absolute but rather a guideline for negotiating with the ranchers. The value of $2.00 was adjusted upwards or downwards depending on greater or lesser age of the chicken. Thus, each rancher was paid an indemnity in accordance with an agreement reached on the basis of the guidelines,
 
 i.e.,
 
 the $2.00 value and the adjustments.
 

 There was no showing that the Secretary acted unreasonably in basing the initial indemnity guidelines on the value of the average chicken in light of the several factors involved such as the numbers of chickens involved, the difficulties of any appraisal system, and the recriminations and claims inevitably resulting from a customized appraisal. Since the applicable regulations permit the appraisal of animals in groups, 9 C.F.R. § 53.3(b), the Secretary decided the egg-laying chickens had the same value per head. The valuation of domestic animals such as chickens is a matter the Congress has delegated to the Secretary in light of the Secretary’s expertise.
 
 See Nabisco, supra,
 
 at 422. There is no evidence that the Secretary’s judgment was wrong.
 
 Red Lion, supra,
 
 395 U.S. at 381, 89 S.Ct. at 1801-1802.
 

 When egg prices rose following the payment of the initial indemnity, the Secretary concluded that the guidelines for the initial indemnity had been inadequate in compensating for the fair market value of the destroyed chickens. Thus, each rancher was paid a supplemental indemnity that was based on a formula which included the rancher’s theoretical lost profits from his flock in the 26 weeks following destruction. The Secretary had calculated that 26 weeks was necessary to raise a chicken to profitable egg-laying age. The appellant believes the supplemental indemnity was a separate payment in compensation of its lost profits until its flock could be replaced. We disagree.
 

 
 *1056
 
 We conclude that the aggregate of the two indemnities provided adequate compensation and that under the statute, the appellant was not entitled to separate indemnities. The law required only that it be paid the fair market value of its flock at the time of the destruction. It did not matter that the initial indemnity may have been inadequate. The supplemental indemnity was not, as advanced by the appellant, to pay for lost profits during the 26-week period following the appraisal and destruction of its flock. Rather, the supplemental indemnity was an adjustment of one element in the initial determination of fair market value, that is, lost profits from egg production during the 26 weeks following destruction. The supplemental indemnity was intended only to add to the first indemnity in order to pay full compensation for the destroyed chickens. The earlier determination of fair market value, resulting in the initial indemnity, included some recognition of lost profits as an element of fair market value, i.e., the values represented by the opportunity to make profits from a chicken. This is evidenced by the guidelines of diminishing value for older chickens, reflecting their decreasing productivity with age. Accordingly, we conclude that the Secretary’s determination of the initial and supplemental indemnities was both objective and reasonable.
 
 See United States v. 564.54 Acres of Land,
 
 441 U.S. 506, 511, 99 S.Ct. 1854, 1857, 60 L.Ed.2d 435 (1979).
 

 Further, the lower court found that the appellant, who was paid an initial indemnity of $5,160,173.97 and a supplemental indemnity of $1,975,255.88 for a sum of $7,135,429.85 as the fair market value of its flock of 3,422,356 chickens, had failed to meet its burden of showing inadequate compensation. In particular, the trial court found the appellant’s actual loss was $5,943,462. These findings are supported by the record and we adopt them.
 

 For the reasons previously stated, we conclude that there was a rational basis for the Secretary’s determination of the fair market value of appellant’s flock, that there was no abuse of discretion lodged in the Secretary, and that there was no violation of the statutory standard.
 

 Ill
 

 Next, the appellant argues that the Secretary arbitrarily and unreasonably applied to it the compensation standards enunciated and adopted by him. Appellant contends that the Secretary should not have applied the uniform standards which may have been appropriate for the typical poultry rancher but which were inappropriate and inadequate when applied to it.
 

 As to the initial indemnity, the appellant contends the Secretary improperly used a formula that was based on the average values of chickens and not on the merits of individual chickens or flocks. Because it produced its own baby chicks and raised them to 26 weeks while other ranchers bought 20-week-old pullets from baby chick growers, the appellant contends it incurred greater costs in raising a chick to 26 weeks, $2.52 as compared to the $2.00 average. Thus, appellant argues the initial indemnity it received was inadequate to compensate the fair market value of its destroyed flock.
 

 It is well established that the cost to a single entrepreneur is not the equivalent of fair market value.
 
 See United States v. Toronto, Hamilton & Buffalo Navigation Co.,
 
 338 U.S. 396, 406, 70 S.Ct. 217, 223, 94 L.Ed. 195 (1949). Moreover, the appellant has failed to show that its flock had a fair market value greater than the amount paid to it.
 
 [4]
 
 As previously stated, there was no showing that the Secretary acted unreasonably in basing the initial indemnity guidelines on the value of the average chicken.
 

 As to the supplemental indemnity, the appellant contends that the Secretary improperly used a formula based on hypothetical lost profits in determining its supplemental indemnity. The supplemental in
 
 *1057
 
 demnity was calculated on the basis of hypothetical, lost profits from egg production at a typical ranch in the 26-week period following destruction of its flock during which a chicken can be raised to profitable egg-laying age. The appellant contends its flock was so large that it was impossible to repopulate in 26 weeks.
 

 As previously stated, the supplemental indemnity was not intended as a payment of the entire fair market value or as a replacement of all lost profits for egg production following the destruction of the rancher’s flock. Rather, the supplemental indemnity was intended as an adjustment or addition to the initial determination of the fair market value, to the extent only of the perceived inadequacy of the earlier payment to compensate for the egg-producing profit element of the fair market value at the time of destruction. Moreover, the statute required only payment of fair market value of the chickens at the time of destruction, not payment of profits after destruction.
 

 Therefore, it was not unreasonable for the supplemental indemnity to be based on the same economic yardstick as the initial indemnity — the 26-week-old chicken. The formulation for the supplemental indemnity was fair.
 
 See Nabisco, supra,
 
 at 422. Moreover, the appellant failed to show it was unable to repopulate its flock in 26 weeks as had others. Again, the Secretary’s judgment is entitled to respect in the absence of “compelling indications that it is wrong."
 
 Red Lion, supra,
 
 395 U.S. at 381, 89 S.Ct. at 1802.
 

 IV
 

 Last, the appellant argues that a constructive change occurred in the contract between the parties when the appellee ordered the appellant to clean and disinfect its manufacturing and support facilities in addition to the “poultry premises” specified in the contract. Appellant argues it is therefore entitled to additional compensation.
 

 The appellant primarily contends that its cleaning and disinfection of other buildings and facilities went beyond the contract phrase “poultry premises” of “Item No. 1” under “Services.”
 
 [5]
 
 Appellant contends the plain meaning of the contract terms required the cleaning and disinfection of only those premises containing poultry. The lower court, however, found numerous references in the contract requiring cleaning and disinfection of appellant’s entire premises,
 
 [6]
 
 “buildings” and “premises.”
 
 [7]
 
 Isolated instances of the phrase “poultry premises” cannot overcome the force of the repeated references indicating coverage of the entire premises. Contract interpretation has been consistently viewed as a harmonizing process in which the various parts of a disputed contract are to be construed as a whole to give meaning to all of its provisions. In
 
 State of Arizona v. United States,
 
 575 F.2d 855, 863 (1978), the Court of Claims held that
 

 [w]e follow the established general rules that provisions of a contract must be so construed as to effectuate its spirit and purpose, that it must be considered as a
 
 *1058
 
 whole and interpreted so as to harmonize and give meaning to all of its provisions, and that an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.
 

 Moreover, the appellant, when ordered, proceeded to clean and disinfect its entire premises without protest. A principle of contract interpretation is that the contract must be interpreted in accordance with the parties’ understanding as shown by their conduct before the controversy.
 
 See Macke Co. v. United States,
 
 467 F.2d 1323, 1325 (Ct.Cl.1972).
 

 V
 

 Thus, the appellant has failed to make the strong, affirmative showing that is necessary to overcome the presumption of correctness accorded to the lower court’s findings of fact.
 
 See Petro-Chem Marketing Co. v. United States,
 
 602 F.2d 959 (Ct.Cl.1979);
 
 Davis v. United States,
 
 164 Ct.Cl. 612 (1964). Moreover, we hold that the legal conclusions of the lower court are correct as a matter of law. Since this holding is dispositive, we do not consider the issue of interest. The judgment of the Claims Court is affirmed.
 

 AFFIRMED.
 

 *
 

 Pursuant to order of this court dated October 4, 1982, the United States Claims Court, on October 6, 1982, entered a final judgment in accordance with Trial Judge David Schwartz’s recommended decision of January 18, 1982.
 

 [1]
 

 . 21 U.S.C. § 114a, in pertinent part, states:
 

 The Secretary of Agriculture * * * is authorized to control and eradicate any communicable diseases of livestock or poultry * * * which in the opinion of the Secretary constitute an emergency and threaten the livestock industry of the country, including the payment of claims growing out of destruction of animals (including poultry), and of materials, affected by or exposed to any such disease, in accordance with such regulations as the Secretary may prescribe.
 

 21 U.S.C. § 134a(d), in pertinent part, states:
 

 [T]he Secretary shall compensate the owner of any animal, carcass, product, or article destroyed pursuant to the provisions of this section. Such compensation shall be based upon the fair market value as determined by the Secretary, of any such animal, carcass, product, or article at the time of the destruction thereof.
 

 [2]
 

 . .9 C.F.R. § 53.3(b), in pertinent part, states:
 

 The appraisal of animals shall be based on the fair market value and shall be determined by the meat, egg production, dairy or breeding value of such animals. Animals may be appraised in groups providing they are the same species and type and providing that where appraisal is by the head each animal in the group is the same value per head or where appraisal is by the pound each animal in the group is the same value per pound.
 

 [3]
 

 . Fair market value is generally defined as
 

 the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts.
 

 Miller v. United States,
 
 620 F.2d 812, 825 (Ct.Cl.1980).
 

 [4]
 

 . There were no objective data in the record which support appellant’s claim that its chickens were more valuable or more productive than average chickens.
 
 See Sternberger v. United States,
 
 401 F.2d 1012, 1016-17 (Ct.Cl.1968).
 

 [5]
 

 . Terms of Contract, in pertinent part, state:
 

 SERVICES
 

 ITEM NO. I
 

 Furnish all personnel, equipment, and services as required for the depopulation of approximately 3,422,400 poultry and the cleaning and disinfection of the
 
 poultry premises,
 
 for the period September 8, 1972 through December 15, 1972, in accordance with the following Terms of Contract. [Emphasis added].
 

 [6]
 

 . Attachment # 1 of Guidelines, in pertinent part, states:
 

 4. Disinfection of Premises, Conveyances, and Materials
 

 Ail premises,
 
 including bams, corral, stockyards, and pens, and all cars, vessels, aircraft, and other conveyances, and the materials therein shall be cleaned and disinfected * * *. [Emphasis added].
 

 [7]
 

 . Terms of Contract, in pertinent part, state:
 

 5. Buildings prepared for cleaning and disinfection according to the following:
 

 * * * * * *
 

 d. Premises sprayed with USDA approved disinfectant according to Government requirements and as directed by a State-Federal official. Disinfectant to be supplied by Contractor.