918 F.2d 186
 37 Cont.Cas.Fed. (CCH) 76,060
 Unpublished Disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
ROWE INDUSTRIES, INC., Plaintiff-Appellant,
v.
The UNITED STATES, Defendant-Appellee.
 No. 90-1113.
 United States Court of Appeals, Federal Circuit.
 Oct. 5, 1990.
Suggestion for Rehearing In Banc Declined Dec. 7, 1990.
 
 1
 Before NIES, Chief Judge,[1] COWEN, Senior Circuit Judge, and BROWN, District Judge.[2]
 
 
 2
 BROWN, District Judge.
 
 
 3
 Appellant Rowe Industries, Inc. ("Rowe") appeals from a decision of the Armed Services Board of Contract Appeals ("the Board") that the Air Force properly terminated for default its contracts with Rowe for the sale of electrical bundles for use in the B-52 bomber. For the following reasons, we will affirm the Board's decision below.
 
 Background
 
 4
 On November 16, 1983, the Air Force, acting through its Oklahoma City Air Force Logistics Center ("OCAMA"), awarded to Rowe contract No. F34601-84-C-0053, The contract required Rowe to supply 80 electrical bundles for use in the B-52 bomb navigation radar system. Forty bundles were to be delivered on or before December, 1984, and the remaining bundles by January, 1985.
 
 
 5
 On May 7, 1984, OCAMA awarded to Rowe a second contract, No. F34601-84-C-1576, for seventy-one more electrical bundles. The contract provided for delivery of the seventy-one bundles by June, 1985 at the same price per bundle as the first contract.
 
 
 6
 The procurements under these two contracts constituted "restrictive acquisitions" under the Department of Defense's High Dollar Spare Parts Breakout Program. Each contract contained identical clauses providing that only the Boeing Airplane Co. and Groman Corp., Rowe's parent corporation, were approved to provide the electrical bundles.[3]
 
 
 7
 The contracts' requirements concerning cable insulation were incorporated by reference. The contracts expressly required that Rowe provide the wire assemblies described in Rowe's drawing of part number 4R1044. Rowe's drawing designated Part Number R1035-1 as the cable to be used in the assemblies. Rowe's drawing for Part Number R1035-1 specified the use of "Okoflex Insulation or Equivalent." These cable assemblies, including the Okoflex insulation, were produced by Okonite Company ("Okonite"). Rowe had used Okoflex insulation in the bundles delivered under all prior contracts since 1975. Okonite was the sole supplier of Okoflex insulation.
 
 
 8
 On May 16, 1984, Okonite notified Rowe that it would no longer produce Okoflex and would replace it with insulation composed of Ethylene/Propylene Rubber ("EPR"). Okonite also forwarded to Rowe documentation in which Okonite asserted that the EPR insulation met or exceeded the applicable requirements for Okoflex.
 
 
 9
 Rowe subsequently contacted Mr. Richard Barry, a quality assurance representative at the Defense Contract Administration Management Area ("DCASMA") in Detroit, Michigan, to inform him of the change in insulation material. Rowe offered sample cables containing the EPR insulation to Mr. Barry for inspection. Mr. Barry declined to inspect them, however, until Rowe had submitted documentation that the new materials met or exceeded requirements.
 
 
 10
 Rowe then submitted a formal value engineering change proposal ("VECP"), seeking approval of the modification. Mr. Barry approved the VECP and forwarded it to the Defense Contract Administration Office in Cleveland, Ohio. There is no evidence of record that Mr. Barry conducted independent tests before giving his approval to the VECP. The Board below found that Mr. Barry had rubber stamped the approval based on Rowe's representations. The VECP thereafter received approval through the next two tiers of review, and was submitted for final approval to OCAMA in Oklahoma City.
 
 
 11
 OCAMA rejected Rowe's VECP, and advised Rowe accordingly. At the hearing before the Board, Mr. Billy Albritton, the aircraft systems electrical engineer responsible for evaluating Rowe's engineering change proposal, testified that the VECP was not approved because the engineering data supplied by Rowe was insufficient. Mr. Albritton expressed concern that the testing of the insulation had been done on a coax cable, not an assembly cable. He concluded that the only way the Air Force could find out whether the cable would work with the EPR insulation would be to subject the cable to extensive testing.
 
 
 12
 Mr. Albritton also testified that during his investigation, he discovered that the cable would be eliminated from the aircraft. The record before the Board demonstrated that the Modification deleting the electrical bundles from the B-52 bomb navigation radar had been released in June, 1980, and was fully approved and implemented by the Air Force by 1982. App. at p. 23. At no time prior to the disapproval of the VECP did the Air Force inform Rowe that the electrical bundles contracted for in the November 16 and May 7 contracts would be obsolete. App. at 24.
 
 
 13
 The next day, Rowe wrote the Air Force and asked that it reconsider its decision. On April 3, 1985, OCAMA responded that it was evaluating its assets and determining whether the requirement for the items still existed. On July 1, 1985, Rowe informed OCAMA that the cables had been completed, and that they were currently delinquent in delivery on the first contract by seven months because they were waiting on approval of the VECP. The VECP, however, was never approved, and Rowe never tendered delivery of the cables with the EPR insulation. In July, 1985, OCAMA terminated the Rowe contracts for default.
 
 
 14
 Rowe timely appealed the terminations. The Board sustained the default terminations in its decision issued on July 31, 1989. The Board found that the Air Force had ordered the electrical bundles in 1983 and 1984 with the "expectation that it would receive bundles which were the same as those which had been qualified and had been procured from Rowe for almost a decade." The Board denied Rowe's motion for reconsideration on November 16, 1989. Rowe filed this timely appeal pursuant to 41 U.S.C. Sec. 607(g).
 
 Discussion
 I.
 
 15
 Pursuant to 41 U.S.C. Sec. 609(b), factual findings of the Board "shall be final and conclusive, and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); Mayfair Constr. Co. v. United States, 841 F.2d 1576, 1577-78 (Fed.Cir.), cert. denied, 109 S.Ct. 528 (1988).
 
 
 16
 The Board's legal conclusions are subject to plenary review. Afro-Lecon, Inc. v. United States, 820 F.2d 1198, 1200-01 (Fed.Cir.1987). Although the Board's interpretation of a contract is a legal conclusion, and therefore freely reviewable, it is afforded careful consideration and great respect. Alvin Ltd. v. United States Postal Service, 816 F.2d 1562, 1564 (Fed.Cir.1987).
 
 II.
 
 17
 The essential question presented in this appeal is whether the Board properly determined that the contract between Rowe and the Air Force required that the electrical bundles be insulated with Okoflex. The Board held that the contracts created a legally enforceable "expectation" that only Okoflex insulation would be used. The Board found that the expectation derived from the parties' prior conduct:
 
 
 18
 Since 1975 when it was originally qualified as the sole manufacturer of the bundles, Rowe had supplied the Air Force with parts insulated only by Okoflex; and when it ordered the specific part number for the bundles, the Air Force acted with the expectation that it would receive bundles which were the same as those which had been qualified and had been procured from Rowe for almost a decade.
 
 
 19
 ASBCA Opinion at 12 (July 31, 1989).[4] The parties' prior and contemporaneous conduct should be considered in interpreting a contract: "a contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051 (Fed.Cir.), cert. denied, 464 U.S. 814 (1983); see Alvin, Ltd., 816 F.2d at 1566 ("One may not ignore the interpretation and performance of a contract....").
 
 
 20
 The Board's finding that the parties' conduct and the circumstances surrounding the contract created a legally enforceable expectation was supported by substantial evidence. Rowe's electrical bundles had been pre-qualified under the Department of Defense's High Dollar Spare Parts Breakout Program, which allowed manufacturers other than an original product manufacturer to qualify their products. The regulations for this program emphasize the need for precise conformance with the approved specifications:
 
 
 21
 The exacting performance requirements of specially designed military equipment may demand that parts be closely controlled and have proven capabilities of precise integration with the systems in which they operate, to a degree that precludes the use of even apparently identical parts from new sources, since the functioning of the whole may depend on latent characteristics of each part which are not definitely known.
 
 
 22
 48 C.F.R. Sec. 217.7203(c) (1989); 32 C.F.R. Sec. 1-313(c) (1984) (emphasis added). The regulation's requirements hold special relevance to products such as the Rowe electrical bundles, as their role in the bomb navigation radar made them indispensable to the success of the mission. These factors, when considered with a ten year history of Rowe supplying bundles insulated with Okoflex to the Air Force, provide substantial evidence for the Board's findings.
 
 
 23
 The Air Force's decision to terminate for default in this instance does not equate with the sort of arbitrary and capricious conduct sufficient to convert a termination for default into a termination for convenience. See Darwin Constr. Co. v. United States, 811 F.2d 593 (Fed.Cir.1987). Darwin arose out of a default termination by the Navy on a construction contract. Darwin, the contractor, was unable to complete the work within the time limits specified in the contract. Darwin notified the Navy that it had been unable to complete the work because necessary equipment had not been delivered on time, but informed the Navy that it was physically and financially ready to complete the remaining work. The Navy nevertheless terminated the contract for default, citing Darwin's lack of diligence in failing to complete the work.
 
 
 24
 On appeal, the Board found that the Navy defaulted Darwin solely because it no longer wished to deal with it. In support of its holding, the Board noted that, among other things, 1) the work that Darwin had performed had been acceptable; 2) the failure to complete the work on time did not interfere with the Navy's use of the building; and 3) at the time Darwin was performing work on the contract, many other construction contractors had suffered delays, and the Navy had not terminated their contracts, but instead collected liquidated damages. Id. at 595. Thus, based on the "unique circumstances present at the time of default," id., the Board found the Navy's conduct arbitrary and capricious. Relying on the Board's findings of arbitrariness, this Court determined that such arbitrariness provided sufficient grounds for converting the termination for default into a termination for convenience.
 
 
 25
 There is no evidence of record now before this Court that suggests such arbitrary conduct by the Air Force. The basis for default is not an inconsequential delay in performance, but a failure to provide qualified parts under a military procurement contract. As a contractor, Rowe carries the burden of securing all necessary material for the performance of its obligations. WRB Corp. v. United States, 183 Ct.Cl. 409, 511-12 (1968). Its failure to do so and its subsequent failure to provide qualified goods constitutes a material breach of the contract. Moreover, there is no evidence of record that the Air Force would not have accepted the goods had they been qualified or had the VECP been approved. Thus, the "unique circumstances" present in Darwin are not present here
 
 
 26
 Because the Board's findings that Okoflex insulation was an implicit term of the contract was based on substantial evidence, and because there is no evidence that the Air Force acted arbitrarily or capriciously in defaulting Rowe, the decision below will be
 
 
 27
 AFFIRMED.
 
 
 28
 NIES, Chief Judge, concurring.
 
 
 29
 I agree that the government's termination of its contract with Rowe for default was proper, but I see the issue quite differently.
 
 
 30
 The contracts in issue covered the supply of certain preapproved parts for B-52 aircraft. The determinative issue is whether the government was obligated to accept goods which Rowe tendered as equivalent to parts which had been technically qualified.
 
 
 31
 Rowe asserts that the value engineering change proposal (VECP) it submitted should have been approved on the basis of the data it submitted showing equivalency between the EPR insulation and Okoflex, or at least the government was obligated to test the assembly units containing the substituted EPR insulation to determine whether or not that insulation was equivalent. The agency found the test data grossly insufficient. It could not be determined that Rowe conducted tests on finished cable and Rowe did not subject the cable to necessary in flight testing. Further, the agency refused to accept and test the substituted part because the contract was for the purchase of preapproved and pre-qualified products. The board agreed, holding:
 
 
 32
 Our decision is based upon the nature of the procurements themselves. We are not dealing with a situation where the Air Force was legally obligated to accept equivalent items. Parts contained in the B-52 were developed through an extensive testing program which resulted in the qualification of approved manufacturers and suppliers for specific part numbers. Since 1975 when it was originally qualified as the sole manufacturer of the bundles, Rowe had supplied the Air Force with parts insulated only by Okoflex; and when it ordered the specific part number for the bundles, the Air Force acted with the expectation that it would receive bundles which were the same as those which had been qualified and had been procured from Rowe for almost a decade.
 
 
 33
 I agree with the board that Rowe's tender of assembly units substituting EPR insulation did not conform to what was required by the contract and that the agency was not required to accept a part which had not been pre-qualified.
 
 
 34
 In reality, Rowe's substantial claim of loss arises because it proceeded to manufacture the nonconforming cable prior to approval of an engineering change, which it submitted, calling for the substitution of EPR insulation. I am unpersuaded that that loss should be shifted to the agency. The goods tendered were nonconforming and, thus, when the contract performance period elapsed, Rowe was in default.
 
 
 35
 I am also unconvinced that the termination for default here must be converted to a termination for convenience under the precedent of Darwin Construction Co. v. United States, 811 F.2d 593 (Fed.Cir.1987). In order to say the termination for default must be so converted under Darwin, that case would have to be read so broadly as to necessitate termination for convenience when the evidence shows that the contracting officer was elated to have a basis for terminating the contractor for default. I do not read Darwin so broadly.
 
 
 36
 The facts here are not similar to those in Darwin. Darwin had performed substantially the work required under the contract and was unable to complete performance in a timely manner solely due to a supplier's late delivery of material. The remainder of the work could not be completed by any contractor until August, 1984 due to the Navy's need to use the facility in the interim. When the Navy terminated Darwin seven months before the date the Navy had scheduled for the work to recommence despite Darwin's past performance and clear ability and willingness to complete performance, albeit in an untimely fashion, we held the contracting officer's decision to terminate for default was a "clear" failure by the contracting officer "to comply with [Armed Service Procurement Regulation] 18-618.4(a)(iii) [ (codified at 32 C.F.R. 18.618.4(a) (1984)) ]." Id. at 598. That regulation requires a contracting officer, in case of default, to consider "the period of time which would be required for the government or another contractor to complete the work as compared to the time required for completion by the delinquent contractor." Since the only reason put forth by the government supporting the termination for default was Darwin's untimely performance, the failure to consider the timeliness of another contractor's completion was dispositive in view of the evidence that the completion date could not be accelerated by terminating Darwin. It was also a "fact" in Darwin that other contractors had suffered delays without the Navy terminating for default and that the Navy did not like dealing with Darwin and were happy to be rid of the company.
 
 
 37
 The Darwin court rejected the board's ambiguous statement indicating that a contracting officer's "motives" in the decision to terminate for default could never be probed. However, the Darwin court said no more than that, and the contracting officer's decision was held arbitrary or capricious not because of motive but because the contracting officer failed to comply with prescribed regulatory considerations. The contracting officer's motive was in fact irrelevant to the result.
 
 
 38
 If we do look at the contracting officer's "motive" in this case, at most the evidence shows that the government stood to benefit as a result of a default termination in that it did not need the B-52 assembly units. Someone at DOD discovered that an adequate supply of the part was on hand, in any event, to meet their requirements during the phase-out of that part.
 
 
 39
 There is no evidence that the government would not have accepted goods conforming to the contract. Nor is there evidence that the government was aware that it did not need the parts prior to Rowe making the goods that it tendered. There is simply no evidence here of a sinister motive in terminating Rowe. The goods were not obtained elsewhere as in Darwin. No regulation was violated. Indeed, Rowe points to nothing in the facts or precedent which required the government to terminate for convenience rather than default when it is clear that the contractor could never be able to supply the prequalified assembly units required by the contract. In order for the Air Force to accept Rowe's proffered units it would have been required to undertake extensive testing not contemplated by the contract. Had it needed the parts, we can speculate that it might have voluntarily undertaken to perform the tests. But it did not even need the genuine parts, much less substitutes that would required expensive and extensive testing.
 
 
 40
 I finally note that while technically the claim decided by the board was the agency's claim for breach, the board's ruling at the same time mooted appellant's claims for termination for convenience damages. Our affirmance of the termination for default, however, does not necessarily mean that the government is entitled to any damages. It is undisputed that the default saved the government money because it had, in any event, an oversupply of the spare parts covered by the contracts.
 
 
 41
 In sum, I would affirm on the basis of the board's opinion.
 
 
 42
 COWEN, Senior Circuit Judge, dissenting.
 
 
 43
 I cannot join in either of the opinions affirming the Board's decision. In my view, the facts found by the Board, plus undisputed facts not included in the Board's decision,[1] demonstrate that the Board erred by failing to convert the contracting officer's termination of the contracts for default into a termination for the convenience of the government.
 
 
 44
 * The affirming opinions, and the Board's decision upon which they are based, rest upon an assumption which I believe is erroneous: namely, that Rowe's contracts required it to furnish only cables insulated with the Okoflex material which had been supplied by Rowe in previous contracts. The conclusion is not supported by the Board's findings and is contrary to the record generally.
 
 
 45
 The record amply supports Rowe's position that under the terms of the contracts, it had the right to submit equivalent insulation and did so when Okoflex was no longer available for the performance of the contracts.
 
 
 46
 The government's cross-motion for summary judgment before the Board, p 6 stated that Rowe's drawing for the cable to be utilized in the assemblies provided for the use of "Okoflex insulation or equivalent." App. 26. Three times during the hearing before the Board, the government's attorney, Mr. Fields, admitted that the contract did not specifically require Rowe to provide Okoflex insulation. Mr. Fields stated: "There is nothing in the contract that specifically says in writing that you will provide Okoflex insulation." App. 27, 33.
 
 
 47
 Again, at App. 100, Mr. Fields stated: "Objection, your Honor. I repeat that my witness has already testified to the fact that there is no specific provision in the contract that says that a certain type of insulation is required."
 
 
 48
 The government based its contention that Okoflex was required in the contracts upon a part number in a drawing made by the Boeing Company and upon the fact that Rowe's drawing contained that same part number. However, Rowe's drawing specified the use of "Okoflex insulation or equivalent." Mr. Billy Albritton, the government's witness upon whose testimony the Board relied heavily, testified as follows: "Q: Mr. Albritton, we agree the word Okoflex does not appear on that drawing? A: It does not appear on that drawing. Q: The word insulation does not appear on that drawing? A: That's correct." App. 93. Mr. Albritton also testified as follows: "The insulation is specified on the Rowe drawing. The Rowe drawing is identified in the contract." App. 108.
 
 
 49
 Even if the government expected Rowe to deliver cables insulated with Okoflex, that expectation did not alter Rowe's contractual obligation, which was to furnish cables insulated with "Okoflex or equivalent."
 
 II
 
 50
 After the contracts had been executed, the Okonite Company, which had supplied the insulated cables to Rowe, advised Rowe that the manufacture of Okoflex had been discontinued and that Okonite was substituting ethylene/propylene rubber (EPR) for the insulation in the cables. At that time, Okonite certified that the EPR insulated cable had been fully tested and met all the applicable requirements. However, the government's inspector refused further inspections of Rowe's cables containing the new insulation until after Rowe had submitted documentation that the new material met or exceeded the contract requirements for "Okoflex or its equivalent." As a result of that action and the government's subsequent delay, Rowe was prohibited from making any deliveries until after the expiration of the delivery deadlines. On October 9, 1984, Rowe submitted to the procuring agency a proposed change order (VECP), requesting approval of cables insulated with EPR rather than Okoflex. Rowe attached the results of a functional test of the cables with the new material and a statement that the substitute was equal to or better than Okoflex, which was no longer available. The Air Force's inspector approved the VECP with a comment that the cable with Okoflex was no longer available, but that the new material was a better material in all respects and would benefit the government by extending the life of the cable assemblies. On December 14, 1984, Mr. Ayers, an engineer with the Defense Logistics Agency of the Air Force, issued a memorandum stating that he had reviewed the VECP for technical adequacy, gross effect on cost, and other factors. He also stated that he could not verify Rowe's claim that the substituted cable had a higher reliability than the Okoflex cable, but that he had sufficient test data to show that a cable using the EPR insulation was equal to or better than the Okoflex cable. He then recommended that the contracting officer approve the VECP as soon as possible. On December 18, 1984, the administrative contracting officer forwarded the VECP and supporting data, along with Mr. Ayers memorandum of December 14, 1984, to the procuring agency. His forwarding document stated that he had reviewed Mr. Ayers' technical report and concurred in the findings set forth therein. He requested a prompt decision on the VECP.
 
 
 51
 On December 19, 1984, Rowe requested that the time for making deliveries under the contract be extended for a period of eight weeks after approval of the VECP. The extension was not granted.
 
 
 52
 On April 3, 1985, almost six months after the VECP had been submitted, the government notified Rowe that the VECP had been disapproved.
 
 
 53
 On July 10, 1985, the termination contracting officer terminated Rowe's contracts for default. The termination was based on the fact that deliveries were not made by the due date of the second contract, June 1985. App. 22, 42.
 
 
 54
 The parties have stipulated that at no time after December 19, 1984, did any representative of the government make an attempt to determine whether the properties, characteristics, form, fit, and function of the EPR insulation were equal to or better than those of Okoflex insulation for use on Rowe's two contracts. The parties have also stipulated that at no time after December 19, 1984, did any representative of the government make an attempt to determine whether Okoflex insulation was commercially available for use on the two contracts.
 
 
 55
 The evidence submitted in Rowe's VECP, including the recommendations and statements made by Air Force representatives, was sufficient to establish a prima facie case that: (1) Okoflex insulation was not commercially available for use in the performance of Rowe's contracts; and (2) the EPR insulation which Rowe proposed to use in manufacturing the cables was equal to or better than the Okoflex insulation. Thereupon, the burden devolved upon the government to overcome the presumption that the cables manufactured by Rowe with the use of the EPR insulation were equivalent to cables insulated with Okoflex and met contract requirements. Space Dynamics Corp., ASBCA No. 12085, 69-1 BCA, p 7662; Jo-Line Tools, Inc., ASBCA No. 7196, 1962 BCA, p 3478. The stipulation quoted above establishes that the government wholly failed to discharge that burden.
 
 
 56
 Because the government failed to overcome the presumption that the material which Rowe proposed to deliver met contract requirements, the Board erred in failing to convert the termination to one for the convenience of the government.
 
 III
 
 57
 It is undisputed that after May 16, 1984, Okoflex was not available and not obtainable from the Okonite Co., Rowe's previous supplier and the sole source of Okoflex. These facts, plus other evidence submitted in support of Rowe's VECP, were sufficient to raise the issue that it would be impossible for Rowe to make deliveries of the material unless the government permitted Rowe to substitute EPR insulated cable for the Okoflex cable. Thereupon, it was the government's duty to act promptly on the VECP, since the government was well aware of the delivery schedule and knew that its own representatives had urged prompt approval of the VECP. However, the government unreasonably delayed action on the VECP for six months, by which time the dates on which Rowe was required to deliver the material had passed. That delay was the primary cause of the default which the contracting officer utilized as the basis for terminating the contract. Under the circumstances, the Board should have held that Rowe's failure to deliver on the dates required was excusable and without its fault or negligence. Following that determination the Board should have then converted the default termination to a termination for the convenience of the government. Milwaukee Transfer Co., ASBCA No. 10814, 66-1 BCA, p 5570.
 
 IV
 
 58
 After a careful study of the entire record, including the reporter's transcript of evidence adduced at the hearing before the Board, I am convinced that the real reason for the government's disapproval of the VECP and the termination of Rowe's contracts was the fact that the Air Force no longer had any need or use for the cables insulated with Okoflex. On January 14, 1982, the Air Force issued a modification which removed or deleted the cable assembly using the Okoflex insulation for further use on B-52 aircraft and substituted a new system.
 
 
 59
 The government has admitted that at no time before the award of the two contracts or thereafter to June, 1985, did the government inform or advise Rowe that the cable assembly insulated with Okoflex was obsolete or was no longer needed or used for its intended purpose in the radar systems of B-52 aircraft. There is no evidence in the record that the cable assemblies ordered from Rowe had any possible use by the Air Force except in the radar systems of the B-52 aircraft.
 
 
 60
 On February 26, 1985, James R. Brakebill, Deputy Chief, Item Management Division, Directorate Material Management of the procuring agency, issued an internal memorandum which was not communicated to Rowe. First, Mr. Brakebill noted that the 1982 modification had removed the cable to be supplied by Rowe from use on B-52 aircraft and had substituted a new system. He stated: "The demand rate is presently seven per month with 156 assets available with only 75 aircraft remaining unmodified. The available assets will fill all future requirements through the completion of the modification which is August, 1986." Accordingly, he then declared that the "VECP is not approved" and recommended that Rowe's contracts be cancelled. His letter concluded with a statement that his memorandum constituted the closing action on the VECP. He gave no other reason for the cancellation of the contracts, and in view of his position in the procuring agency, I think we must accept his memorandum as an authoritative determination by the procuring agency that the government no longer had any need for the cables to be supplied by Rowe and that the contracts were terminated for that reason.
 
 
 61
 The contracting officer directed the engineer, Billy Albritton, to make an analysis of the VECP for the purposes of determining whether the cables with the EPR insulation were equal to or better than the cables insulated with Okoflex. Mr. Albritton testified that he declined to make that analysis because it would require an extensive period of testing and a considerable outlay of money. Tr. 1-213, 214. He also stated that at the time he reviewed the VECP, he learned that the government no longer had any use for the cables to be supplied by Rowe. Therefore, he recommended as Mr. Brakebill had previously recommended, that the contracts be cancelled. Tr. 2-118.
 
 
 62
 On April 3, 1985, the same date on which Rowe was notified that the VECP had been disapproved, the procuring agency issued a Termination Authorization to its Termination Activity. App. 146. The authorization contained a handwritten statement to the effect that in view of the government's delay in approving or disapproving the VECP and the information gained during the investigation of the VECP, including Mr. Brakebill's memorandum of February 26, 1985, it was considered that a termination of the contracts for convenience would be in the best interests of the government. However, the form contains another handwritten note, stating that on the recommendation of the termination contracting officer, the recommendation would be changed to one to terminate the contracts for default, after cure and show cause notices were issued. The contracting officer did not issue either a cure or a show cause notice. As previously stated, he terminated Rowe's contracts on July 10, 1985.
 
 
 63
 There is a statement in both of the affirming opinions that there is no evidence that the government would not have accepted cables insulated with Okoflex if Rowe had tendered them on time. In my opinion that speculative statement is completely refuted by what actually occurred. The Termination Authorization of April 3, 1985, referred to above, shows that Rowe's contracts were terminated because of Mr. Brakebill's determination that the material was no longer needed by the Air Force.
 
 
 64
 In summary, this case is, as I see it, like Schlesinger v. United States, 392 F.2d 702, 709 (Ct.Cl.1968), in which the contractor's default served only as a useful pretext for a default termination, because the agency found it necessary to take that action on grounds unrelated to the contractor's performance. In this case, the Air Force terminated Rowe's contracts on the stated ground that it had defaulted in making the required deliveries, but the real reason for the termination was that the Air Force had no need or use for the materials to be supplied by Rowe, either at the time the contracts were entered into or at any time thereafter.
 
 
 65
 For all the reasons stated above, I would reverse the Board's decision and remand the case with instructions that the Board should convert the termination for default into one for the convenience of the government.
 
 
 
 [1]
 Judge Nies became Chief Judge on June 26, 1990
 
 
 [2]
 Judge Garrett E. Brown, Jr., United States District Court for the District of New Jersey, sitting by designation
 
 
 [3]
 The Air Force awarded the contracts to Rowe after Boeing "no bid" the solicitation
 
 
 [4]
 In its reply brief, Rowe argues that any course of dealing arguments raised by the Air Force should be disregarded because the Air Force waived such arguments before the Board. See App. at 27:2-3, 70:12-71:3. The record, however, does not clearly demonstrate what arguments the Air Force waived, if any. Indeed, at one point in the proceedings, the Board overruled the objection of counsel for Rowe on the waiver issue and permitted counsel for the Air Force to question witnesses regarding performance under prior contracts. Id. at 70:12-1:3. Accordingly, we find Rowe's waiver argument meritless
 
 
 [1]
 When a board of contract appeals fails to make a relevant finding of fact, the court may make supplemental findings based on undisputed facts. Blinderman Const. Co. v. United States, 695 F.2d 552, 555, n. 2 (Fed.Cir.1963)